MATIENZO, PLAINTIFF AND APPELLANT, *v.* GONZÁLEZ ET AL., DEFENDANTS AND APPELLEES.

APPEAL from the District Court of San Juan, Section 1, in an Action of Ejectment.

No. 1682.—Decided June 27, 1918.

POWER OF ATTORNEY—CONSTRUCTION.—The construction given to a power of attorney by the acts of the parties for several years relieves the court of the duty of carefully considering the terms in which it is expressed.

ID. — COMPROMISE — DOUBTFUL CLAIM — COLLATERAL ATTACK. — A doubtful claim is sufficient to support a compromise agreement. If the compromise of the parties must depend upon the question of whether the parties have settled the disputes just as the law would have done, then it may be truly said that a compromise is a useless act and benefits nobody, even putting in question the capacity of the parties to make the compromise. Although in view of the conclusion already reached we need not now decide the question, it would appear to follow that here, as in Louisiana, and apart from general principles governing all contracts, such an agreement is not open to collateral attack.

The facts are stated in the opinion.

*Mr. Damián Monserrat, Jr.,* for the appellant.

*Mr. Pedro González García* for the appellees.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

On June 2, 1900, Julián Matienzo y Ahedo and Josefa

González. y Jiménez, the first as surviving spouse and the second as mother and heir of Juana Cebrián, deceased, executed a notarial instrument containing the following clauses:

"*Fifth.*—That for the foregoing reasons the appearing party, an heir of Juana Cebrián, admits as a fact, which, in view of the present status of Julián Matienzo, must be affirmed, that not only has there been no ganancial property during the marriage, but that there have been losses due not only to the great expense necessarily incurred during the last few years in caring for the health of both spouses, culminating in the death of Juana Cebrián, but also to political events and the recent hurricane, the occurrence of which has produced a great commercial stagnation in every way.

"*Sixth.*—That although several properties appear to have been acquired during the wedlock, the fact is that said purchases were made with the proceeds of property belonging to Julián Matienzo before his marriage and therefore represent a part of the capital contributed by him, although in different form.

"*Seventh.*—That in order to clarify matters and with a view to a better understanding of the source of everything, the parties have made a sworn inventory, including all credits of every kind now existing in favor of Julián Matienzo, as well as all property owned by him at the time of his marriage, showing that the former amounts to 115,292 provincial *pesos* and the latter to 122,835.17 *pesos,* and therefore that there have been considerable losses and no community property remains to be partitioned as ganancial assets.

"*Eighth.*—That Juana Cebrián brought nothing to the marriage and contributed nothing to the community thereafter, and what remains. therefore, belongs to Julián Matienzo, who should receive and hold the same, certain properties as his contribution to the marriage and others in part payment of such contribution.

"*Ninth.*—That in the registry of property the title to the following properties, acquired prior to the marriage, appears of record in the name of Julián Matienzo (describing them):

*          *          *          *          *          *          *

"*Twelfth.*—That in view of the foregoing facts, accepted by both parties because all of the same are known to them and are strictly true, the said parties freely and spontaneously

"AGREE

"*First.*—That an inventory of all the property existing at the time of the death of the above-mentioned Juana Cebrián having

been made as aforesaid and privately, the parties being of age, it clearly appears that after deducting the property contributed by Julián Matienzo to the conjugal partnership there is no ganancial property of any kind, but, instead, there are considerable losses.

"*Second.*—That Juana Cebrián not having contributed anything to the conjugal partnership and there being no community property, it is evident that there is nothing to be inherited by the mother, party hereto and adjudged intestate heir of said Juana Cebrián.

"*Third.*—That in consequence thereof Josefa González y Jiménez, in her capacity of universal heir of her daughter Juana Cebrián, ratifies the approval given to the private inventory referred to, which she deems to be a faithful expression of the actual facts, for the reasons already stated; and therefore that, as there is no contribution other than that of Julián Matienzo, any liquidation or any allotment or anything else, save an express acknowledgment that whatever is left belongs exclusively to the surviving spouse Julián Matienzo, is entirely useless and without reason to justify it.

"*Fourth.*—That for the same reason and as a logical inference from the foregoing, Josefa González y Jiménez acknowledges and affirms that all property of whatever kind left at the death of her daughter belongs in fee simple to Julián Matienzo, who receives it in part as property owned by him prior to his marriage and in part as property acquired during marriage, but with money exclusively his own, and this without proceedings of any kind and without reservation to Josefa González y Jiménez of any right or cause of action whatever, which she acknowledges henceforth not to have.

"*Fifth.*—By virtue of the said acknowledgment Julián Matienzo is authorized to add to the entries in the registry of property such others as may be necessary or proper to show his exclusive ownership of all the properties of whatever kind, whether acquired before or after his marriage and without limitation or reserve.

"*Sixth.*—For the same reason he may also record in his name and as his exclusive property, whenever he may think proper, all property of the kind aforesaid and not previously recorded."

A private document signed after the death of Julián Matienzo is set forth in the record as follows:

"In San Juan, Porto Rico, on December 27, 1904, Josefa González y Jiménez, party of the first part, of age, a resident of Santurce, widow of Cebrián, and Joaquín Matienzo y Amavizcar, party of the second part, a merchant, of age, a resident of San Juan, in his

own behalf and in the name and stead of his sister Rosario, both heirs of Julián Matienzo y Ahedo, giving in her name *cautionem de grato et rato,* and in default thereof under his exclusive personal liability, set forth:

"1. JOSEFA GONZÁLEZ, WIDOW OF CEBRIÁN: That together with her son-in-law Julián Matienzo Ahedo, on June 2, 1900, before Notary Tomás Valldejuly, of Bayamón, shortly after the death of her daughter Juana Cebrián y González, wife of said Matienzo, she signed an instrument acknowledging, for the reasons therein set forth and as heir of her said daughter, that there was no community property, all existing properties included in the inventory and valued with the consent of the exponent on May 20, 1900, belonging, therefore, to Julián Matienzo; but that since the death of the latter she has had occasion to become convinced, by examination and study of the data, aided by her counsel, Rafael López Landrón, and her son-in-law Juan O'Neill, that the inventory and appraisement were lacking in accuracy, and upon a general rectification thereof she considers that the true liquidation of the estate of Julián Matienzo at the time of the death of her daughter Juana should have disclosed community property accruing to exponent as heir amounting to $30,000 approximately, having had the intention of filing suit to assert her rights.

"2. JOAQUÍN MATIENZO: That in his opinion the said deed of June 2, 1900, and the inventory and valuation preceding the same, signed by Josefa, expressed the true situation of the actual capital of Julián Matienzo, showing that there was no community property, to which Josefa, by reason of her own conviction, agreed, having continued thereafter to accept a pension of $40 a month, a gratuitous home and other benefits extended by Julián on account of her destitute condition.

"Notwithstanding these statements, both parties being desirous of avoiding the damages and expenses of litigation, and especially Joaquín Matienzo of avoiding opinions disparaging to his mercantile credit to which such litigation might give rise, they have agreed definitely to settle the matter of liquidation and payment of the community property existing at the time of the death of Juana Cebrián, as follows:

"In the first clause the properties to be received by Josefa in payment through such settlement, amounting to $22,272, are enumerated and described.

"The second clause recites that the instrument in which this

settlement is to be solemnized and which is to meet all legal require-
ments, and especially those prescribed by the Mortgage Law for record
of the real estate in the registry of property, shall be executed as
soon as Joaquín Matienzo shall have received a power from the other
heir and record of the partition of the property can be had, which,
unless some incident or unforeseen event should occur, may be within
two months.

"The third clause reads as follows: 'This contract, however, shall
take effect on January first next, after which date Doña Josefa shall
receive the rents of the properties transferred to her and shall be
liable for the payment of taxes and expenses. On January 2 she
shall receive the sum of $1,000, the debentures of the Banco Territorial
y Agrícola de Puerto Rico, the jewels under a receipt signed before
a notary public, and the stock shall be transferred to her if the bank
accepts the power of Don Joaquín as executor to make the transfer,
or, in default thereof, when the partition is made.'

"The fifth clause reads as follows: 'The conveyance of house No.
27 San Francisco Street shall be made under the resolutory con-
dition to be recorded in the registry, that it shall be rescinded and
remain without force or effect in case Doña Josefa in person, or
through assignee or otherwise, should file any suit to annul or rescind
the instrument of June 2, 1900, or this agreement of compromise,
or should she, as heir of Doña Juana, demand from the Succession
of Julián Matienzo anything but the fulfilment of this present settle-
ment. The said resolutory condition shall continue in force after
the death of Doña Josefa until her lawful or testate heirs accept
and confirm by a notarial document this present settlement, where-
upon said resolutory condition shall be canceled in the registry of
property.'

"The sixth clause reads as follows: 'Josefa states that this present
settlement is made with the advice of Attorney Rafael López Lan-
drón and that of her son-in-law, Juan O'Neill, who, after having
examined all the antecedents which they have thought proper, deem
it just and equitable. Joaquín Matienzo states, in turn, that he
has consulted Attorney Francisco de Paula Acuña, who has advised
him to accept this settlement, and the three have signed this document
and the later instrument of conformity. Doña Josefa states, in con-
clusion, that she is liable for the expenses of the tomb in memory
of her daughter Juana.'

"The seventh clause reads thus: 'This private document is made
and signed in duplicate, a copy for each party, and shall be sub-

stituted by the public instrument in which the terms herein contained shall be set forth as fully as may be necessary for clearness and binding force.  Josefa González, widow of Cebrián.  Joaquín Matienzo.  Franco. de P. Acuña.  Rafael López Landrón.  Juan O'Neill.' "

This was followed by a notarial instrument of compromise and sale, dated February 21, 1905, and described in the statement of the·case thus:

"APPEARANCE:

"Party of the first part, Josefa González, widow of Cebrián, and party of the second part, Joaquín Matienzo y Amavizcar.

"The party of the second part, Joaquín Matienzo, appears in his own behalf and as attorney in fact of his sister Rosario Matienzo y Amavizcar, according to the power executed in his favor by said Rosario Matienzo y Amavizcar on December 6 last, which, copied literally, reads as follows:

"The power as copied in said deed reads:

"'Rosa Matienzo y Amavizcar covenants:  That she gives and confers power as ample, general and sufficient as may be required by law to enable Joaquín Matienzo y Amavizcar,

" 'First:  Privately or judicially to demand the delivery and to take possession of the properties, rights, and choses in action belonging or that may belong to the executing party as heir, legatee, or successor in interest of her deceased uncle Julián Matienzo y Ahedo, and said properties, rights and choses in action to administer, rule and govern; to look after and collect the rents and products thereof; to lease real properties for a period of more or less· than six years; to maintain unlawful detainer proceedings and to dispossess those who may detain them, and to execute any kind of contract; to do any act and take any action pertaining to a free and general administration.

" 'Second:  To represent the executing party in all testamentary transactions occasioned by the death of her said uncle, Julián Matienzo y Ahedo, in regard to inventories, appraisements, valuations, partition or allotment of properties; to appoint expert appraisers; to approve or impugn said transactions; to execute and sign the documents and public instruments that may be conducive to the liquidation of the estate of the deceased; and, taking possession of the properties allotted to the executing party, to cause the real estate to be recorded in the registry of property.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

" 'Fourth: To sell and alienate property, real and personal; to constitute mortgages, etc., and to assign, settle and compromise all rights whatever that the executing party may have, or that may belong to her.'

" (Power executed in Bilbao, Spain, dated December 6, 1904, before Notary Francisco Hurtado y Saracho.)

"They state:

"*First.*—That on December 27, 1904, they privately executed a document of compromise and sale of properties and delivery of things of value the text of which is as follows:

" (The document above outlined, marked Exhibit A for the plaintiff, is copied.)

"First clause of the executory portion:

" 'That giving full effect to the agreement of compromise above transcribed, he sells and transfers in favor of the other appearing party, Josefa González, widow of Cebrián, title and full ownership of the real properties next hereinafter mentioned.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

" '*Third.*—This compromise is made for the settled and agreed consideration of $22,272, which Josefa González, widow of Cebrián, acknowledges to have received from the other appearing party, Joaquín Matienzo Amavizcar, prior to this act, as follows:

" '$509, value of stock and debentures of the Banco de Puerto Rico and of the Banco Territorial y Agrícola;

" '$961, value of the enumerated jewels;

" '$1,000, delivered to her in cash, and the remainder of

" '$19,802, price of the properties transferred under this deed."

Some ten years later Rosario Matienzo, who lives in Spain and has never resided in Porto Rico, brought suit to recover the property so transferred to Josefa González, alleging want of consideration and of power on the part of Joaquín Matienzo and as a second cause of action alleged "that the alienation of the enumerated properties by Joaquín Matienzo was made unduly and without just cause or reason. It was ineffectual to extinguish any pre-existing or valid obligation; it did not destroy any right or discharge any lawful debt in favor of the defendant or of any other person. He acted by mistake and, rather than the seriousness and merits of

the pretended claim of defendant, considered the adverse opinions that might have been formed with regard to his commercial standing in the event of a resort to the courts.''

Josefa González, after denial, accompanied by positive averments with regard to these matters, set up as a further defense that—

"*First.*—Plaintiff has no cause of action for recovery in eject-ment of the properties, subject of the complaint, because the defend-ant possesses in good faith, under just, legal and perfect title of record in the registry of property, the validity of which has not been previously attacked, an indispensable pre-requisite to a reven-dicatory action.

"*Second.*—The whole prayer of the complaint virtually implies the rescission or annulment of the contract of February 21, 1905, and any action to that end is barred by the statute of limitation in Porto Rico.''

The testimony of Josefa González, as outlined in the record, is—

"That after the death of her daughter she never discussed money matters with Julián Matienzo, her son-in-law, because she thought him a good and honest man, and he always told his wife, the daughter of the defendant, not to worry; that witness would not be left unpro-tected; that everything he had would be hers; that he would not be unfair to witness. That a few days after the death of her daugh-ter witness saw him carrying the books up and down, and they car-ried them to the *mirador* and were writing in them. That afterwards Julián said to her, 'You must sign here,' and as at the time she was not thinking of money matters or of anything else, she signed every-thing because she conscientiously believed that her son-in-law was good and honest, delivering to him the jewels and everything; that when Julián left for Spain he told witness that the jewels belonged to her because they were presents from him to the daughter of wit-ness, and that he did not give them to her in Santurce because they might be stolen. That for six months she lived in the company of her son-in-law until she went to Santurce, delivering to him the jewels and various gold coins for safe keeping, remembering that there was a collar worth $1,000 and that afterwards the jewels which they delivered to her were worth $300.

"That during the six months that she lived with her son-in-law witness never talked with him about money matters; that Matienzo made her sign several documents; that she realized the nature of the document executed before Valldejuly after she signed it and after she recovered her senses. That her son-in-law told her, 'You will have a pension and that house in usufruct,' and she answered that that could not be so because when he married her daughter she knew what he had, that it was very little; that he bought Trujillo afterwards and that Julián himself told his wife in the presence of witness, 'Trujillo is yours,' nor did she talk about money affairs; that when her daughter was dying she said to Matienzo, 'Trujillo is mine, you have given it to me in words; leave it to my mother; do not abandon her'; that her daughter died in 1900.

"She adds that when the inventory was signed she was not present, and that if she signed it, it was because Matienzo himself presented the document in the presence of her nephew, Alberto González; that she signed everything they brought her; that she did not see the notary Valldejuly; that she saw nothing and knows nothing; that they said to her, 'Sign here and here,' and that she signed, knowing not what she did, believing in the honesty of her son-in-law. And, further, 'When my daughter was dying she called Matienzo and said to him, "The only thing I ask of you is not to abandon my mother."' To which he replied, 'You know I have always taken care of her and have loved her like a mother.' The rest of the testimony of this witness refers to the participation on her behalf of her nephew Alberto G. González in the inventory; to her possession of a letter from him in which he says that he knows nothing of what occurred, and to the writing of a letter to said González charging him with not having warned her not to sign the documents above referred to, and to the fact that she never authorized her nephew to represent her in that transaction."

Joaquín Matienzo testified in part as follows:

"That he is an honest man and acted conscientiously, and there were three executors who acted, one of them a person of great worth, a Madrid banker named Llagudo. On November 4, 1904, Julián Matienzo died; that witness received a cablegram from Llagudo, a banker in Madrid, and by next mail a copy of the will and saw to whom the estate was left. There were several bequests in trust in Spain, a usufruct in Madrid, and the properties left to the widow, Josefa González, were in usufruct, two houses in Santurce, Stop 23.

Then witness showed the will to the defendant and naturally she was astonished, and it seems that she was not satisfied, and then witness said· to her, 'Don't worry, I will continue giving you every month what Julián used to give you, in view of the fact that you are now old and in a destitute condition, and I shall always try to help you'; and she told witness that she had other rights, and witness tried to counsel her in order that she might leave the matter as it was; that she should see the will; that witness had done nothing against her; that she was not satisfied but that he would always try to give her on his own account the monthly pension which Julián used to give her; that in the letter witness received from Llagudo he said he wished to put the matter in the hands of his friend Francisco de Paula Acuña, the former attorney of Julián Matienzo and an honorable man, so that he might arrange everything because he had full confidence in him.  Witness went to attorney Acuña and put the matter in his hands, and Acuña told him to bring all the deeds—everything he had—and an exact statement of all the property of Julián Matienzo, which he did, the defendant then presenting herself with the attorney Rafael López Landrón and others, with whom witness had several interviews, and being unable to discuss the question with them he delivered the matter to Acuña in order that he might present it to the court.  About two months elapsed in discussion between the attorneys and then Acuña advised witness to settle the matter, because there were certain things that in his opinion ought to be settled before resorting to the courts; that he pointed out to Acuña that he was only one of the executors, but that there were two others, Manual Cañals and Quirico Llagudo, respectable persons, who should be consulted to ascertain their opinion as the witness, executor and heir needed their advice; that he cabled submitting the matter to Llagudo, who replied expressing his concurrence; that the first compromise had already been made and that on making it provisionally witness had no power to execute the instrument before a notary. Llagudo told plaintiff to send the power immediately if she did not wish to endanger her property; that the power ought to be a special one in order to make the partition and compromise—'this one'— (exhibiting a paper saying that it had been drawn by Acuña), and that a month and a half later he received said power together with a letter from his sister to save the situation, which letter witness states is in his hands, to make the partition and compromise.  That in this matter he acted so conscientiously that he can prove it by books and documents; that the books show $30,000 and there was

$48,000, and witness could not state the contrary because he is an honest man; that he could not say to the attorney López Landrón that the balance was $30,000 when in fact it was $48,000; that it was painful to witness that defendant should be left destitute and that his feelings obliged him to make the settlement and he suffered for several months, discussing the matter with all the attorneys; and witness exclaims, 'In the hands of López Landrón, I wish to ask the court, what could I do?' (que haría yo).

"Continuing, witness adds: The right of Josefa González arises from the undervaluation made of the estate of Julián Matienzo; that Josefa González was the mother-in-law of Julián Matienzo; that the daughter of the defendant was married to Julián; that there was no issue of the marriage; that at the death of Julián a considerable estate was left; that said estate was distributed in many bequests in trust and among other nephews of the deceased, the portion of witness being junk and financial difficulties. Witness is positive that the condition of the estate of Julián before and after his marriage may be ascertained; that during the conjugal community they acquired property, among others the Trujillo farm, owned and possessed by witness, who has been for thirty-five years in Porto Rico, having returned. That he came directly to his uncle, with whom he remained until the former went away ill, and then witness remained as his uncle's attorney in fact, was with him while he was unmarried, and the uncle married, and on that account witness knew of the condition of the estate at the one time and the other, and that there was ganancial property.

"And witness continues: That the defendant made a claim against the Succession of Julián Matienzo, although witness does not remember whether judicial proceedings were instituted. That Francisco de Paula Acuña made himself responsible for witness in order that the property should not be attached, answering for the honesty of witness and later said to López Landrón that he assumed responsibility for any failure on the part of witness to receive the power and authority to carry the agreement into effect; that, not having the power, witness said, 'So far as I am concerned I will do it'; that he did not ask his sister for the power; that it was Quirico Llagudo who asked for it. Witness wanted to settle for himself alone, but López Landrón wished them both to act; that witness consulted with the latter, who told his sister to send the power immediately to witness in the form necessary to make the settlement; that witness would be saved but she would not lose her interest. That Francisco Acuña said to

witness: 'Look here, Joaquín, you must do this because this and this will happen, and you must do it'; that witness informed his sister of the partition and settlement and that she approved it all, and that the power came expressly for that purpose, because the partition could not be made so long as the defendant's claim was unextinguished; that his sister, the plaintiff, ratified the compromise by letter, and witness has in his hands about fifty of such letters.

"To questions put by the plaintiff he says:. That he did not bring said letters to the trial; that he could look for them; that they were in the hands of Mr. Texidor; that a memorandum exhibited refers to the private contract and is in the handwriting of Francisco de Paula Acuña; that on December 27, 1904, when the compromise was made, the power had already come, but the signature of the sister's husband was lacking and it was necessary to ask for another power including · that formality, and then it came.

"To questions put by the court witness answered: That when he made the settlement he did it on the basis that there was ganancial property in the conjugal partnership of Juana Cebrián and Julián Matienzo, and that he can show the court the balance made at the death of Doña Juana; that he knows of the existence of ganancial property by the balances he has in his possession showing a capital of $30,000, and there was in fact $48,000, and it was done in order to make an instrument showing that there was no ganancial property; that the properties were appraised at a value less than the purchase price, and witness could not contend with a lawyer by lying because they would make him bring the books and these would show the contrary; that he knew that the general balance of the estate of Julián was greater than before his marriage because witness had the balance sheets in his possession.

"On cross-examination as to how witness could explain the fact recited and accepted in the private document, where he himself says that, in his opinion, the said instrument of 1900 and the inventory and valuation prior thereto subscribed by Josefa González, the defendant, was the expression of the true situation of the estate of Julián Matienzo, showing that there was no ganancial property, to which defendant agreed, and thereafter continued accepting a certain pension and other benefits, he answers: 'My attorney had to put it into some sort of shape in order to defend me. I believe that it is the form used by my counsel so that the other party might see that it was a special concession.' And he adds that he saw in the matter the danger that they might be left without a cent. He clearly

specifies  *  *  *  that the business owed $18,000, which he had to pay, and the instrument of compromise guaranteed that defendant would make no claim against him nor against the heirs; that he made such compromise on his own account and on behalf of his sister because he had a power from her authorizing him to do it, and the other executors wanted to end the matter; that witness does not believe that any man would make a gift of his property.

"Counsel for the defense asked whether in the contract of compromise and settlement it was provided in the fifth clause that the sale of house No. 27 in San Francisco Street should be made subject to the resolutory condition susceptible of record in the registry that it would be rescinded and without effect in case defendant or her heirs should institute an action to annul or rescind the deed of June 2, 1900, or the said contract of compromise and settlement, or should demand, as heir of her daughter, from the Succession of Julián Matienzo anything save the fulfilment of the compromise, and whether this condition was not made because at another previous time the defendant had accepted the non-existence of ganancial property during the wedlock of her daughter, and whether in order to guarantee this she did not bind herself to make no claim whatever, this clause being the consideration for the sale of said house, and witness answered 'Yes'; that witness told Acuña that he should be guaranteed because at that time there was some sort of movement, just or unjust, and witness was not that kind of man. He became nervous; did not wish to go to court, and asked that it be done for his own tranquility and that of his sister, which was not obtained from Landrón in one nor fifteen days, but after much discussion.  *  *  *

"That Julián Matienzo was an exceptional man, of a generous nature; that his wife's family had much to thank him for because he protected them, as he protected many other poor families living in San Juan; that the defendant also was under great obligation to him, which witness knew because he lived with them and knew the private affairs of the family; that due to such gratitude the defendant could not say to Matienzo, 'I will sign nothing that you wish me to sign'; and witness believes this to be the truth in conscience and before God. Julián was a kindly man; witness guarantees there was no man like him. But he was a very cautious man.

"Witness knew that the instrument by Julián Matienzo and his mother-in-law stated that there was no ganancial property. Witness was not present at the time of the execution of said deed. Witness insists that there was ganancial property, on the ground of the

valuation of the rural properties, and that he knew there were rural properties acquired during the wedlock; that the money with which Trujillo was purchased was acquired in part after the marriage; that when Julián died his estate had increased and there was $48,000 in the hardware store and that it had been put at $30,000 to show there was no ganancial property; that other properties had been undervalued. A document was exhibited to witness by the attorney for defendant and identified as the memorandum for the compromise made several days before by Attorney Acuña, in or about the month of October, 1904, and written by him in the presence of witness. That in making the compromise with Josefa González witness knew of the instrument and inventory signed by her and Julián Matienzo one or two months after the death of his wife; that witness knew the contents of said instruments, and that notwithstanding the same there was ganancial property; that he knew this at the time of making the compromise because the properties were worth more than the assessed value and had been acquired during the wedlock. That when Matienzo married they only had a few lots, several houses, and the hardware store.

"To questions put by the court witness added: That when Mrs. Matienzo died the estate had increased; that the properties were valued at less than they had cost; that there was $48,000 in the hardware store and the inventory showed only $30,000; that the Trujillo property appeared as being worth $10,000 when it was acquired for $28,000, and so the remaining property, and that the inventory was used as a basis for the execution of the deed authorized by the notary Valldejuly."

There were no other witnesses. No objection was made to any part of the testimony of these two, and no effort whatever was made to contradict or discredit the same.

Thereupon the trial judge dismissed the action, for reasons stated in his findings, as follows:

"Because the private contract of December 27, 1904, referred to in the third paragraph of the complaint, was ratified by public deed of February 21, 1905, executed before Notary Eduardo Acuña Aybar by Joaquín Matienzo Amavizcar, duly authorized as attorney in fact of his sister, plaintiff herein, the several transfers of real properties made by said instrument in favor of the defendant having been recorded in the registry of property.

"Because the alienation was not gratuitous, as alleged by the· plaintiff, but by virtue of a compromise made with sufficient consideration and which after ratification contains all the requisites called for by the law.

"Because when both plaintiff and defendant derive title from the same source and the right to recover real property is based on the nullity of defendant's title, it is necessary first to demand the annulment of the latter, as only by such annulment may plaintiff's title recover its force and effect inasmuch as both titles can not stand.

"Because in any event the action to set aside and annul the contract of February 21, 1905, would be barred by section 1268 of the Civil Code."

Each of the conclusions above outlined, upon which the court below rested its judgment, is assigned as error.

As to the first proposition, appellant insists that the power of attorney can not be regarded as retroactive; that the original agreement contained in the private document is the only contract; that the later notarial instrument was merely an attempt to "authenticate" the same for purposes of record; that we should look not to the form but to the substance, the fact being that Matienzo acted without authority and subject to the approval of his sister; that the power to compromise is a general power and not the "express commission" (*mandato expreso*) required by section 1615 of the Civil Code; that the power of attorney contains no suggestion of ratification and should be strictly construed; that section 1259 of the Civil Code should control; that even if Matienzo had power to compromise, he had no power to pass title to the property of plaintiff in payment of debt, and that in any event indefinite and undetermined rights constitute no consideration.

If, as plaintiff alleged and still insists, but wholly failed to prove, she had no knowledge whatever of what had been done until within a few months before filing suit; if she had not waited ten years before taking action; if her attorney in fact had not assumed to act as he did under the power of attorney; if there were nothing before us but the

private document and the power of attorney, then the contention of appellant unquestionably would be entitled to serious consideration. But the uncontradicted testimony of Joaquín Matienzo shows that the whole matter was placed at once in the hands of the attorney who had represented Julián Matienzo up to the time of his death; that this was done at the instance of the co-executor and adviser of plaintiff in Spain; that plaintiff was fully informed of the situation; that the power of attorney was executed for no other purpose than that of enabling witness to settle with Josefa González; that the power of attorney had in fact been received by him before the private document was executed but without the signature of plaintiff's husband, and that he had many letters from his sister with regard to these matters, the said correspondence being in the hands of a prominent San Juan attorney whose name was given.

A curious circumstance, apparently overlooked · by both parties, is that the power of attorney seems in fact to have been executed on December 6, 1904, some three weeks prior to the signing of the private document; and the manifest confidence with which Joaquín Matienzo in the paper last mentioned vouches for the attitude of his sister. toward the transaction likewise lends strength to his statement. But more significant still is the outstanding fact that for a decade plaintiff did nothing.

On February 21, 1905, Joaquín Matienzo had full and express power from his sister both to compromise claims against the estate of Julián Matienzo and to alienate property. Under that power he assumed either to ratify or to carry out the private agreement already entered into by him on behalf of his sister as well as himself, or else to substitute therefor a formal contract involving and including, in any event, the transfer of the interest of his principal in certain real and personal property. In so doing he also parted with his own interest in the same property and acted upon the advice of an able lawyer chosen by the banker in Spain, also an

executor, with whom the sister was in close contact; and if the testimony above outlined be true, it is somewhat difficult to avoid the conclusion that the settlement so reached was about as satisfactory a result as reasonably could have been expected.

But, however this may be, the sister, with full knowledge of her brother's action, by her conduct acquiesced therein and adopted it as her own. It is too late now for her to raise technical questions as to whether or not the deed of February 21, 1905, was in strict legal sense a ratification, or as to whether or not the power of attorney could be fairly construed to authorize such ratification, or as to whether or not the language thereof was specific enough to support the compromise of the particular claim in question, or to authorize the alienation of the identical property actually transferred in settlement thereof.

In order to sustain the alleged gratuitous character of the alienation appellant seeks to avoid the effect of the agreement of compromise and sale upon the theory of no ratification, practically discards all the testimony after attempting to show that it is unworthy of serious consideration, and relies on the instrument of June 2, 1900; on the inventory which preceded and formed the basis of the same; on the will, and on the failure of the defendant Josefa González to establish the actual existence of community property. We need not rehearse the testimony already quoted as to the circumstances surrounding the execution of the notarial instrument of 1900, corroborated as it is by the events of 1904 and 1905; and the interpretation placed on the power of attorney by the parties thereto, through their conduct, relieves us from a scrutiny of its terms.

A somewhat doubtful claim will suffice to sustain an agreement. 5 R. C. L. 880–81, secs. 5–6; 12 C. J. 322; 13 C. J. 349; 12 Manresa, 97.

"If the compromise of the parties is made to depend on the ques-

tion whether the parties have so settled the dispute as the law would have done, then it may be truly said that a compromise is an unavailing, idle act which questions even the power of the parties to bind themselves." 6 R. C. L. 663, sec. 71.

The argument under the third and fourth assignments assumes the want of both consent and consideration, but this, as we have shown, is a false premise. The contract was voidable only, not absolutely void, and, by the terms of section 1717 of the Civil Code, *res judicata* between the parties. It would seem to follow, although in view of the conclusions already reached we need not now decide, that here, as in Louisiana, and aside from general principles governing all contracts, such an agreement is not open to collateral attack. See 12 Manresa, 122-23; *Oglesby* v. *Attrill*, 105 U. S. 605.

We find no reversible error and the judgment appealed from must be

*Affirmed.*

Justices Wolf and del Toro concurred.

Chief Justice Hernández and Justice Aldrey took no part in the decision of this case.